Honorable Leif B. Erickson
Federal Magistrate Judge
Missoula Division
Russell E. Smith Courthouse
201 East Broadway, Room 370
Missoula, MT  59802

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

———————————————————————————

MARLENE McCLUSKEY,

                                         CAUSE NO. CV 04-191-M-LBE

                 Plaintiffs,

       vs.                                  ORDER

ALLSTATE INSURANCE COMPANY, an
Illinois Insurance Company, and
ALLSTATE CORPORATION, a
Delaware Corporation,

                 Defendants.

———————————————————————————

    This matter comes before the Court on Defendant Allstate
Insurance Company's Motion for Summary Judgment on Plaintiff's
(1) Unfair Trade Practices Act Claims, and (2) Request for
Punitive Damages.  Upon consideration of the motion, briefs and
materials filed by the parties the Court hereby enters the
following:

                         ORDER

    Defendant Allstate Insurance Company's motions are **DENIED.**

ORDER – PAGE 1

DONE and DATED this  1ˢᵗ  day of February, 2006.


 /s/ Leif B. Erickson 
Leif B. Erickson
United States Magistrate Judge


**RATIONALE**

## I.  PLAINTIFFS' ALLEGATIONS

Plaintiff's pleading arises from Defendant's handling of her underinsured motorist insurance claims.  She alleges as follows:

On February 23, 2002, Plaintiff incurred damages as a result of an automobile accident.  (First Amend. Compl. at ¶¶ 7-8.)  She subsequently settled with the negligent driver's insurance carrier for policy limits.  (*Id*. at ¶ 10.)  Because her damages exceeded those limits, she submitted claims under her two underinsured motorist policies with Defendant.  (*Id*. at ¶ 11.)

Despite Plaintiff's demands to settle her claims, Defendant repeatedly refused to do so.  (First Amend. Compl. at ¶¶ 11-12.)  Defendant failed to reasonably investigate, and failed to reasonably attempt to settle her claims even though it had sufficient information to do so.  (*Id*. at ¶ 12.)  Defendant also refused to stack the coverage from the two insurance policies. (*Id*.)

The reason for Defendant's refusal to settle Plaintiff's claims is its adherence to a claims handling policy designed to "unreasonably drive down the amount Allstate paid to resolve

personal injury and underinsured motorist claims[.]" (First

Amend. Compl. at ¶ 13.)   Defendant enforced the policy by

> delaying the payment of personal injury and underinsured
> motorist claims, forcing claimants and insureds to either
> accept unreasonably low settlement offers or incur the
> expense and time delay of litigation in order to be properly
> compensated under the laws of Montana.

(*Id.*)   Defendant's policy is in violation of Montana's Unfair

Trade Practices Act (UTPA) because it is designed to "avoid

prompt and reasonable investigation, evaluation, and settlement

of personal injury and underinsured motorist claims[,]" and

Defendant followed such policy in processing Plaintiff's claims.

(*Id.*)

Defendant's unfair claims handling procedures under its

policy include:  unreasonably low valuation of claims; rewarding

claims personnel for settling claims below the initial

unreasonably low valuation; discouraging claimants from seeking

legal representation and rewarding claims personnel for such

discouragement; forcing claimants to resort to litigation to

achieve a fair settlement; discouraging litigation by refusing to

compromise on settlement offers and other tools used by

Defendant; and requiring claimants who secure legal

representation to communicate with out-of-state adjusters.  (*Id.*

¶¶ 13(a)-(g).)  Defendant's conduct in applying the policy to

Plaintiff's claims was intentional and warrants an award of

punitive damages.  (*Id.* at ¶ 13.)

ORDER - PAGE 3

Defendant concealed from Plaintiff the material aspects of its policy described above, and concealed from Plaintiff its application of such policy to Plaintiff's claims for the purpose of causing injury to Plaintiff, thereby committing actual fraud. (First Amend. Compl. at ¶ 14.)  Defendant deliberately followed such policy with regard to their review of Plaintiff's claims, and such conduct constituted actual malice.  (*Id.*)

Plaintiff's First Amended Complaint sets forth three causes of action as follows:  (1) breach of contract and resulting damages for Defendant's failure to pay underinsured motorist coverage under the two policies; (2) Defendant's violations of the UTPA at Mont. Code Ann. § 33-18-201(4) and (6); and (3) punitive damages for actual malice and actual fraud.

## II.  APPLICABLE LAW – SUMMARY JUDGMENT

A party moving for summary judgment is entitled to such if the party can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the nonmoving party.  *Id.* at 252.

## III. DISCUSSION

### A.    Procedural Irregularities

Defendant moved for summary judgment on October 28, 2005. There are three immediate problems with this.  The first is that the motion for summary judgment was not timely filed given the "fully briefed" motions deadline set forth in the scheduling order in this case which was November 10, 2005.  That meant that the Motion and supporting brief were due no later than October 18, 2005, considering service was by mail (3 days) and 20 days for Plaintiff to thereafter file a responsive brief.

The next problem is that L. R. 56.1(a) requires the party moving for summary judgment to file a Statement of Uncontroverted Facts. While it is true that the rule does not specifically state the Statement is due simultaneously with the motion the implication is clear given that under L.R. 56 (b) the party opposing the motion must file a Statement of Genuine Issues. In this instance the Defendant did not file its Statement of Uncontroverted Facts until December 2, 2005, and only after Plaintiff had pointed out such omission to Defendant.

Finally, in support of its motion for summary judgment Defendant references Exhibits it concurrently filed on October 28, 2005.  The problem with these Exhibits is that they come with nothing, such as an affidavit, to authenticate they are what they purport to be.  Rule 56(c) of the Federal Rules of Civil

ORDER - PAGE 5

Procedure provides that the court consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which would demonstrate the moving party is entitled to judgment.  Rule 56(e) provides for attaching sworn or certified copies of papers or parts thereof to an affidavit.  In the absence of an affidavit with the attached exhibits as provided under the Rule this court ought not even consider the exhibits.

On the basis that the motions are untimely and not in accord with L.R. 56 as discussed supra the motions are subject to being denied.  Since the parties have fully briefed the motions the court will consider them likewise on the merits, including the improperly tendered exhibits since, while Plaintiff contests the propriety of the exhibits being filed absent leave of court, she does not appear to contest the authenticity of the exhibits.

### B.   Undisputed Facts

### 1.   Correspondence Between the Parties

The basic chronological history of the events and correspondences between the parties is not in dispute and is as follows:[1]

Plaintiff had a congenital defect in her right knee beginning in 1981 which required treatment and surgeries over the

---

[1]The specific medical opinions on which the parties rely are discussed below in a separate section.

subsequent 20 years.  She had some injuries and pain during that period of time, and by the time of her accident she already had "severe degenerative arthritis".  (Def.'s Statement of Uncontroverted Facts (SUF), Ex. 9.)

Plaintiff injured her right knee in the February 2002 accident.  The emergency room records report Plaintiff suffered a broken rib, and the right knee x-rays noted Plaintiff's prior arthritis and reconstruction, but the records note that "[n]o acute fracture or dislocation is evident."  (Def.'s SUF, Ex. 9.) Plaintiff concedes the accident aggravated a pre-existing condition, but nevertheless, she contends she has a permanent impairment from her injuries.

Following the accident Plaintiff began treatment for her knee with Dr. Iverson.  By April 8, 2002, Dr. Iverson's records reflect Plaintiff reported "progressive improvement", and he determined the "[k]nee joint is otherwise quite normal."  (Def.'s SUF ¶ 15, Ex. 2.)  Plaintiff then began treatment with Dr. Heetderks.

The at-fault driver's insurer, Progressive Ins. Co., paid policy limits of $25,000 on April 29, 2003, consisting of approximately $3,400 for medical expenses, and $21,600 for damages and future medical expenses.  (Def.'s SUF ¶ 18; Pl.'s Statement of Genuine Issues (SGI) ¶ 1.b.)

Plaintiff filed her claims with Defendant around March 17, 2003, stating her medical expenses were going to exceed $25,000.

ORDER - PAGE 7

(Def.'s SUF, Ex. 12.)  By March 24, 2003, Defendant sent medical and wage release forms to Plaintiff for her to sign, and it requested a list of Plaintiff's medical providers and the name of Plaintiff's employer.  (*Id.*, Ex. 24.)  It also began obtaining information from Progressive.  By April 2, 2003, Defendant began requesting medical bills and records from Plaintiff's providers. (*Id.*, Ex. 19.)

Plaintiff then re-injured her knee and lower back in late April 2003, while lifting weights.  In an October 21, 2003 letter to Plaintiff Dr. Heetderks' stated he could not causally connect that re-injury to the February 2002 accident.  (Def.'s SUF, Ex. 33.)

On May 11, 2003, Plaintiff demanded full stacked policy limits of $50,000 from Defendant. (Def.'s SUF, Ex. 16.)  She asserted that in light of her current need for treatment, her potential future knee replacement, lost time from work, and pain and suffering, her total damages would exceed $75,000.  (*Id.*)

On May 22, 2003, Defendant requested from Plaintiff's husband records and documentation from Progressive showing what medical bills it had paid.  (Def.'s SUF, Ex. 12.)

On May 23, 2003, Defendant sent a letter to Plaintiff in response to her $50,000 demand advising it was awaiting receipt of all the documentation it had requested.  (Def.'s SUF, Ex. 17.)

By June 6, 2003, Plaintiff had completed treatment with her

ORDER – PAGE 8

physical therapist, and Plaintiff had reported to her therapist
her pain had resolved.  (Def.'s SUF, Ex. 18.)

On June 11, 2003, Defendant requested updated medical
information from Dr. Heetderks.  (Def.'s SUF, Ex. 25.)  That same
date it also renewed its requests for medical records from
Plaintiff's other medical providers.  (*Id.*, Ex. 21.)

On June 12, 2003, Defendant told Plaintiff it was still
waiting to receive records regarding the April 2003 re-injury to
her knee, and an updated report from Dr. Heetderks.  At that time
Plaintiff informed Defendant she expected five more years of
injections and that surgery was a possibility.  (Def.'s SUF ¶
31.)  Plaintiff states she requires Synvisc injections every 4-6
months.  (Pl.'s SGI, ¶ 6.e.)

On July 3, 2003, Defendant's attorney sent a letter to
Plaintiff in response to her inquiries regarding the stacking of
her claims, advising it was his opinion the ruling of the Montana
Supreme Court which provided for stacking would not apply
retroactively to her claim.[2]  (Def.'s SUF, Ex. 26.)

On July 18, 2003, Defendant again sent a request to Dr.
Heetderks to obtain an update on Plaintiff's knee.  (Def.'s SUF,
Ex. 27.)  Although Defendant was still waiting for the requested

---

[2] This, as we know, turned out to be incorrect as the Montana Supreme Court
subsequently determined that stacking was retroactive.  *Dempsey v. Allstate*, 325 Mont. 207, 104
P3d 483 (2004).  The reliance by Defendant on counsels conclusion that stacking was not
retroactive would apparently defeat any claim on this point arising under the UTPA.  See Judge
Molloy's order in Hardy v. Progressive Specialty Ins. Co. CV-01-130 dated Jan 12, 2006.

information, it advised Plaintiff it thought she had already been fully compensated by Progressive.  (*Id.*, Ex. 12.)

On August 19, 2003, Mr. McCluskey demanded Defendant pay Plaintiff full policy limits due to the cost of anticipated future injections and the possibility of a future knee replacement.  Defendant advised Mr. McCluskey it still had nothing from Plaintiff's doctor outlining her future treatment needs.  (Def.'s SUF, Ex. 12.)  That same day Plaintiff wrote Defendant a letter stating her April 2003 "flare up" was related to the automobile accident knee injury.  She then asserted a minimum of $90,000 in damage and demanded Defendant pay full policy limits.  (*Id.*, Ex. 29.)

On September 23, 2003, Defendant sent a letter to Plaintiff advising that based on the information provided by Progressive, the physical therapist, Dr. Heetderks, and the April 2003 emergency room records, Defendant believed Plaintiff had already been fully compensated, although it acknowledged Plaintiff did not agree with such assessment.  While Defendant pointed out there was no current plan for a knee replacement, it agreed to monitor the situation.  (Def.'s SUF, Ex. 30.)

On October 2, 2003, Plaintiff informed Defendant she believed it had improperly denied her coverage despite the existence of her damages in excess of the payments she received from Progressive.  At that time she advised Defendant her medical

expenses and lost time expenses would be close to $10,000, but she did not provide any information regarding the number of hours lost, or her hourly wages.  (Def.'s SUF, Ex. 20.)  Defendant responded by stating it had not denied her claim, but that it simply disagreed with her evaluation of her damages.  (Def.'s SUF, Ex. 31.)  It reminded Plaintiff it believed she had been fully compensated, but it was willing to monitor her case, and Defendant again requested wage loss documentation and evidence of future medical bills which might increase the valuation of Plaintiff's claim.  (*Id.*)  Defendant advised it would be "happy to review any additional information" Plaintiff could provide. (*Id.*)

On November 11, 2003, Defendant again explained its need for wage loss documentation and medical bills from Plaintiff. Defendant advised her claim was still open for review and that it would still consider and evaluate any additional information Plaintiff wished to submit.  (Def.'s SUF, Ex. 35.)

### 2.   Plaintiff's Doctor's Opinions

At some point Defendant came into possession of Dr. Heetderks' December 16, 2002 letter to Progressive.  In that letter the Doctor had concluded Plaintiff suffered a "significant loss of functional capacities since her February injury[,]" and "has not been able to return to [the] same level of activity" she enjoyed prior to the accident.  (Def.'s SUF ¶ 17, Ex. 10.)  He

ORDER – PAGE 11

stated he had "no doubt that eventually she may require a total joint arthroplasty, though [she] is too young to make this a good option at this point in time." (*Id.*)  He also opined Plaintiff may need a "high tibial osteotomy", but he did not plan to perform surgery in the near future. (*Id.*)  He hoped a knee replacement would not be necessary for 5 to 10 years. (*Id.*)  He then provided a partial estimate of the cost of a high tibial osteotomy and a knee replacement. (*Id.*)  The letter also, however, recognizes Plaintiff had a pre-existing condition in her right knee and the letter does not give any opinion as to whether the 2002 accident caused her to need a knee replacement. Plaintiff states the cost of the knee replacement could exceed $40,000, though it is unclear how this figure was arrived at. (Pl.'s Opposing Br. at 10.)

On July 10, 2003, Dr. Heetderks sent a letter to Defendant advising he was treating her knee arthrosis with Synvisc injections every 6 months. (Def.'s SUF, ¶ 35, Ex. 28.)  He advised "[a]ny consideration of surgery has been placed indefinitely into the future at this point in time." (*Id.*) Again, the letter does not discuss what caused Plaintiff to need the replacement surgery.

On October 21, 2003, Dr. Heetderks sent Plaintiff a letter stating undoubtedly the 2002 accident permanently worsened her knee condition. (Def.'s SUF, Ex. 33.)  He stated it is

"anticipated that total knee arthroplasty will eventually be required[,]" but she was too young to undergo the procedure at that point.  (*Id*.)  Dr. Heetderks stated the 2002 accident accelerated Plaintiff's need for surgery based on the reductions in Plaintiff's activities subsequent to the accident, but he hoped she could still put it off for 10 years or so.  (*Id*.)  The letter similarly notes Plaintiff's pre-existing need for surgery, and does not give any indication as to how much the accident accelerated the need for surgery.

In response to Defendant's November 11, 2003 letter requesting information, on January 5, 2004, Dr. Heetderks sent another letter to Defendant discussing apportionment of Plaintiff's knee injury.  Although he believed an accurate apportionment was not possible, he believed 75% of Plaintiff's current symptoms were attributable to the 2002 accident and Plaintiff was "minimally symptomatic prior to that injury." (Def.'s SUF ¶ 44, Ex. 36.)  He stated if Plaintiff had a knee replacement at that point in time, he would attribute 75% of the need for that replacement to the accident.  (*Id*.)  But, he qualified that if she needs a replacement in 5 or 10 years "these figures may be entirely irrelevant." (*Id*.)  He also told Defendant Plaintiff sustained a permanent impairment due to the accident, but he did not assign an impairment rating.  (*Id*.)

####       3.   Defendant's Settlement Offer

On February 20, 2004, Defendant re-evaluated Plaintiff's damages based on the information it had.  Since Plaintiff had already received $25,000 from Progressive, in Defendant's valuation her excess damages were only $5,000 to $10,000. (Def.'s SUF ¶ 46.)  Therefore, Defendant offered to settle Plaintiff's claims for $5,000, which would have been in addition to Plaintiff's settlement from Progressive and the medical bills Defendant had already paid.  Defendant added, though, that it would still consider further information and documentation from Plaintiff.  (Def.'s SUF, Ex. 38.)

The record helps explain the basis for Defendant's offer. Defendant's initial $5,000 offer on February 20, 2004, states it "included an estimate for future medical and future wage loss." (Def.'s SUF, Ex. 38.)  Defendant's Colossus calculations took into account Plaintiff's permanent impairment, her future need for surgical procedures, and her future medical costs estimated at $10,280.  (*Id.*, Ex. 37.)

On March 13, 2004, Plaintiff sent Defendant a letter asserting it had mishandled her claim, she was dissatisfied with its offer, and she demanded a reasonable offer to settle, but she did not provide Defendant with any further information.  (Def.'s SUF, Ex. 39.)  Defendant responded to that letter on March 22, 2004, and again confirmed it had taken into account Plaintiff's

future medical expenses and wage losses, but noted that Dr. Heetderks' opinion stated any consideration of surgery is indefinitely reserved for the future.  (*Id.*, Ex. 40.)  It noted Plaintiff still had not submitted certain medical bills for review, and it advised it would be willing to consider any further submission of medical bills from Plaintiff.  (*Id.*)

In March and April 2004 Defendant received further medical bills and paid them.  (Def.'s SUF ¶ 50.)

On April 27, 2004, Plaintiff requested that Defendant explain how it arrived at the $5,000 settlement offer in light of the "real issue" she saw which was the cost of her future medical needs.  (Def.'s SUF, Ex. 41.)  She also advised her medical bills and lost time were approaching $9,000.  (*Id.*)

On May 5, 2004, Defendant again explained its $5,000 offer to Plaintiff.  It stated it had not previously had all of Plaintiff's medical bills, but the bills it then had totaled only $7,364.65, and approximately $3,400 of those bills had already been paid by Progressive.  (Def.'s SUF, Ex. 42.)  Defendant advised it still had not received all the necessary wage loss documentation or information from Plaintiff's employer.  (*Id.*) Defendant reiterated its $5,000 offer was based on the type of accident, the type of injury, all the information provided by Plaintiff, the medical providers, Progressive, and Dr. Heetderks' opinion regarding Plaintiff's future need for medical care.

(*Id.*)

On May 12, 2004, Plaintiff, through her husband, again inquired about Defendant's offer and he requested an itemized breakdown of the offer. (Def.'s SUF, Ex. 43.)  He explained how they calculated the $9,000 of medical bills and lost time. (*Id.*) Mr. McCluskey expressed his frustration and concern that they may have to hire an attorney, and he requested Defendant pay at least the one policy limit of $25,000 until the stacking issue was decided by the Montana Supreme Court. (*Id.*)

On May 25, 2004, Defendant again explained its $5,000 valuation and settlement offer which was the same explanation provided in its May 5, 2004 letter, and it also noted Plaintiff had already received $25,000 from Progressive. (Def.'s SUF, Ex. 44.)  It explained the medical bills for Plaintiff's back injury in April and May 2003 were from lifting weights and doing squats. (*Id.*)  It again advised it was still waiting to receive wage loss documentation, particularly from Plaintiff's employer. (*Id.*)

From June through October 2004 Defendant continued to pay Plaintiff's medical bills. (Def.'s SUF ¶ 55.)  Defendant states to this day it is still paying medical bills submitted by Plaintiff.

Plaintiff filed this lawsuit in September 2004.  On December 1, 2004, Defendant reminded Plaintiff its $5,000 offer was in addition to the medical bills it had already paid and the $25,000

Progressive had already paid.  (Def.'s SUF, Ex. 45.)  At that
time Defendant still had not received all of Plaintiff's wage
loss documentation, and asked Plaintiff to provide further
information it could consider in evaluating her claim.  (*Id*.)
Defendant states Plaintiff never told it who her employer was, so
it was unable to obtain the wage documentation itself.  (Def.'s
Reply Br. at 2.)

### 4.   Defendant's IME of Plaintiff

After this lawsuit was filed Defendant then arranged for
Plaintiff to have an independent medical exam in August 2005,
conducted by Dr. Capps.  Dr. Capps concluded many of Plaintiff's
knee complaints were pre-existing.  Although Dr. Capps was unable
to apportion Plaintiff's current symptoms between her pre-
existing condition and the 2002 accident (Def.'s SUF, Ex. 46),
she concluded Plaintiff would still have needed a knee
replacement even if she had not been in the 2002 accident.
(Def.'s SUF, Ex. 46 at 16.).  Dr. Capps acknowledged the 2002
accident likely caused Plaintiff's need for a knee replacement
"to occur sooner than otherwise might have been the case."  (*Id*.)

### B.   UTPA Claims

Plaintiff filed this action September 21, 2004.  She alleges
Defendants violated two subsections of the UTPA which provide
that an insurer may not

> (4) refuse to pay claims without conducting a reasonable
> investigation based upon all available information;

[...]

> (6) neglect to attempt in good faith to effectuate prompt,
> fair, and equitable settlements of claims in which liability
> has become reasonably clear[.]

Mont. Code Ann. § 33-18-201(4) and (6).

Defendant now moves for summary judgment on the basis of the statutory UTPA defense which provides as follows:

> (5) An insurer may not be held liable under this section if
> the insurer had a reasonable basis in law or in fact for
> contesting the claim or the amount of the claim, whichever
> is in issue.

Mont. Code Ann. § 33-18-242(5).

The party asserting the defense under § 33-18-242(5) bears the burden of establishing it by a preponderance of the evidence. *Watters v. Guaranty National Ins. Co.*, 300 Mont. 91, 111, 3 P.3d 626, 639 (2000), *overruled on other grounds*, *Shilhanek v. D-2 Trucking, Inc.*, 315 Mont. 519, 525-26, 70 P.3d 721, 725 (2003). "Reasonableness [under § 33-18-242(5)] is generally a question of fact[]" properly presented to the trier of fact just like "any other disputed issue of fact based upon the evidence and circumstances of each case."  *Dean v. Austin Mutual Insurance Co.*, 263 Mont. 386, 389, 869 P.2d 256, 258 (1994).

In *Watters* the court pointed out that even though it was undisputed in *Dean* that the insured had been charged with arson, the issue of whether the charges gave the insurer a reasonable basis in law or in fact to deny the claim was properly presented to the trier of fact.  *Id*.  If arson charges in *Dean* are not

sufficient to provide a reasonable basis in law or in fact for a
UTPA defense, then it is hard to imagine a situation which would
be sufficient.  *Watters* itself involved an insurer's reliance on
a prior case law decision establishing a legal conclusion based
on a given set of facts.  *Id.* at 112, 3 P.3d at 639.  Therefore,
it is only in certain situations involving a prior legal
determination that reasonableness under the defense can be
determined as a matter of law; reasonableness can be resolved on
summary judgment "where the underlying 'basis in law' is grounded
on a legal conclusion, and no issues of fact remain in dispute."
*Id.* at 112, 3 P.3d at 639.[3]  Absent a clear statute or case law
in Montana declaring a specific factual situation always
reasonable, then reasonableness must be decided by the trier of
fact as directed in *Dean*.

Based on the foregoing, although the jury could ultimately
resolve the issue of reasonableness in favor of Defendant,

---

[3] *See Burton v. Mountain West Farm Bureau Mutual Ins. Co.*,
214 F.R.D. 598, 602, 605-606 (D. Mont. 2003) (finding no disputed
issue of fact and concluding as a matter of law insurer had no
legal duty to stack insurance coverage and, therefore, insurer
had a reasonable basis in law for refusing to stack coverage)
*Bartlett v. Allstate Ins. Co.*, 280 Mont. 63, 70, 929 P.2d 227,
231 (1996) (finding no disputed issue of fact and concluding as a
matter of law plaintiff did not have an insurable interest and,
therefore, insurer had a reasonable basis in law for not paying
insurance claim); *Watts v. Westland Farm Mutual Ins. Co.*, 271
Mont. 256, 264, 895 P.2d 626, 630 (1995) (finding no dispute as
to the material facts and concluding as a matter of law no
insurance policy was in effect at the time of the loss and,
therefore, insurer had a reasonable basis in law for not paying
claim).

particularly under the foregoing facts, yet Defendant's asserted reasonable basis in fact as a complete defense under Mont. Code Ann. § 33-18-242(5) cannot be resolved as a matter of law.

Although Dr. Heetderks originally thought any surgery would indefinitely be put off for the future, in January 2004, prior to Defendant's settlement offer, he opined if Plaintiff had a knee replacement at that point in time, he would attribute 75% of the need for that replacement to the accident.

But, then Dr. Heetderks qualified that if Plaintiff needs a replacement in 5 or 10 years then the apportionment figure may be entirely irrelevant, again suggesting surgery may be indefinitely put off for the future and questioning the cause of Plaintiff's need for surgery. As a matter of law damages may not be based on mere guess or speculation, so Dr. Heetderks' qualified opinion weighs in favor of Defendant's defense. *See In re Marriage of Mease*, 92 P.2d 1148, 1155 (Mont. 2004). Despite the uncertainty, the record establishes Defendant at least took into account Plaintiff's need for a knee replacement, which means the parties' ultimate dispute might only be as to the amount of such replacement.

All these facts raise genuine issues of material fact and make it impossible for the Court to definitively state as a matter of law that Defendant had a reasonable basis in law or in fact to justify its conduct in contesting the amount of

Plaintiff's claim and not offering more than $5,000.

Defendant puts a significant amount of weight into Dr. Capps' medical evaluation.  However, the timing of such evaluation (conducted in August 2005) renders Dr. Capps' opinion irrelevant to the UTPA claims and Defendant's defense.

In deciding whether an insurer had a reasonable basis in law or in fact the evidence is limited to the law as it existed, and the facts as they were known to the insurer, at the time it decided not to advance damage payments.  *EOTT Energy Operating Ltd. Partnership v. Certain Underwriters at Lloyd's of London, 59 F. Supp. 2d* 1072, 1076 (D. Mont. 1999) (granting motion in limine limiting insurers' presentation of facts to only those facts known to them at the time they made the decision to deny coverage), *remanded on jurisdictional grounds, EOTT Energy Operating Ltd. Partnership v. Winterthur Swiss Ins. Co.*, 257 F.3d 992 (9th Cir. 2001).  In both *Watters* and *Shilhanek*, supra, the Montana Supreme Court limited its consideration of whether a reasonable basis in law existed based on the law as it existed at the time the insurer refused to pay damages.  *Watters*, at 112, 3 P.3d at 639 and *Shilhanek*, at 528, 70 P.3d at 727.  Furthermore, as pointed out in *EOTT* the language of Mont. Code Ann. § 33-18-242(5) is written in the past tense in that the consideration is whether the insurer "had" a reasonable basis for its conduct. Therefore, any after-acquired information cannot be used to

justify prior conduct.

Based on the foregoing, Dr. Capps' August 2005 opinion cannot be used to justify Defendant's alleged conduct which occurred in 2003 and 2004.

Accordingly, Defendant's asserted defense under Mont. Code Ann. § 33-18-242(5) with regard to liability under the UTPA should be denied and left for resolution by the jury.

### C.   Punitive Damages

Defendant argues its Defense under Mont. Code Ann. § 33-18-242(5) also bars Plaintiff's punitive damages claim.  *See Dees v. American Nat. Fire Ins. Co.*, 861 P.2d 141, 154 (Mont. 1993). Because, as noted, that defense is for the jury to resolve, so too should the issue of punitive damages go the jury, provided, of course, that Plaintiff first presents a sufficient prima facie case.